FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.
*   SEPTEMBER 26, 2022   *
BROOKLYN OFFICE

AAS:JAM
F. #2021R01110

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

      - against -

YURY OREKHOV,
ARTEM USS,
SVETLANA KUZURGASHEVA,
    also known as "Lana Neumann,"
JUAN FERNANDO SERRANO PONCE,
    also known as "Juanfe Serrano,"
JUAN CARLOS SOTO,
TIMOFEY TELEGIN and
SERGEY TULYAKOV,

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Judge Komitee
Magistrate Judge Pollak

I N D I C T M E N T

Cr. No. 22-CR-434 _____

(T. 18, U.S.C., §§ 371, 554,
981(a)(1)(C), 982(a)(1), 982(a)(2),
982(b)(1), 1343, 1349, 1956(h), 2
and 3551 et seq.; T. 21, U.S.C.,
§ 853(p); T. 28, U.S.C., § 2461(c);
T. 50, U.S.C., §§ 1705(a), 1705(c),
4819(a)(1), 4819(a)(2)(A)-(G),
4819(b), 4819(d)(1) and 4819(d)(2);
T. 15, C.F.R., § 736.2(b)(1))

THE GRAND JURY CHARGES:

INTRODUCTION

      At all times relevant to this Indictment, unless otherwise indicated:

I.    The Defendants

      1.    The defendant YURY OREKHOV was a Russian national who resided

in Germany and the United Arab Emirates.  Since at least 2015, OREKHOV served as the

part owner, Chief Executive Officer and Managing Director of Nord-Deutsche

Industrieanlagenbau GmbH ("NDA GmbH"), a privately-held industrial equipment and

commodity trading company located in Hamburg, Germany.  OREKHOV previously

worked as a procurement manager for a publicly-traded Russian aluminum company (the

"Aluminum Company") controlled by a Russian billionaire and industrialist (the "Oligarch"), an individual whose identity is known to the Grand Jury.

2. The defendant ARTEM USS was a Russian national who resided in Russia. USS was a part owner of NDA GmbH and the son of a Russian politician who served as the governor of Russia's Krasnoyarsk Krai region. USS had ownership interests in several Russian companies in Krasnoyarsk Krai and elsewhere, including a coal mining company in Krasnoyarsk. USS also held a senior position with a subsidiary of a Russian state-controlled oil conglomerate.

3. The defendants YURY OREKHOV and ARTEM USS each held a fifty-percent share of NDA GmbH. NDA GmbH operated a subsidiary in Switzerland ("NDA AG"). OREKHOV and USS also owned and controlled several corporate entities in other jurisdictions throughout the world, including, among others, NDA Aerospace Research Sdn. Bhd. ("NDA Aerospace") in Malaysia, OOO[1] Setevye Tekhnologii ("Setevye Tekhnologii") in Russia, Opus Energy Trading LLC ("Opus Energy") and Melissa Trade Limited ("Melissa Trade") in the United Arab Emirates.

4. The defendant SVETLANA KUZURGASHEVA, also known as "Lana Neumann," was a Russian national and an employee of NDA GmbH working under the supervision of defendant YURY OREKHOV. KUZURGASHEVA was also the Chief Executive Officer of Setevye Tekhnologii, a purported electronics trading company, the name of which means "Network Technologies" in Russian.

---

[1] "OOO" is the abbreviation for the Russian business entity type, "общество с ограниченной ответственностью," which means limited private company and is roughly the equivalent of a limited liability company or LLC in the United States.

5.     The defendant JUAN FERNANDO SERRANO PONCE, also known as "Juanfe Serrano," was a Spanish national and the Chief Executive Officer of a project management and commodities trading company with offices in the United Arab Emirates, Italy and Spain.

6.     The defendant JUAN CARLOS SOTO was affiliated with a commodity trading company in Venezuela.

7.     The defendant TIMOFEY TELEGIN was a Russian national and the owner of Abtronics, a supplier of electronic equipment to the Russian military and aerospace industry, located in Moscow, Russia, and Almaty, Kazakhstan.   On January 26, 2018, the U.S. Department of Commerce ("DOC"), Bureau of Industry and Security ("BIS"), added TELEGIN and Abtronics to the Entity List, which was found at Title 15, Code of Federal Regulations, Part 774, Supplement Number 4.   The Entity List imposed additional license requirements and export restrictions based on a determination that certain individuals and companies had engaged in activities contrary to U.S. national security or foreign policy interests.   As to TELEGIN and Abtronics, BIS determined that they procured "U.S.-origin items and transferred them to entities of the Russian military and parties on the Entity List without the necessary licenses."   83 Fed. Reg. 3577.

8.     The defendant SERGEY TULYAKOV was the Sales Director at Joint Stock Company Foreign Economic Association Radioexport ("Radioexport"), a trading company located in Moscow, Russia.   On September 7, 2016, BIS added Radioexport to the Entity List, because Radioexport "operate[d] in Russia's arms or related material sector."   81 Fed. Reg. 61595.   Shortly after being added to the Entity List, Radioexport changed its

name and began operating as "Joint Stock Company Network Technologies" ("Network

Technologies"), which was a distinct entity from Setevye Tekhnologii.

II.     Relevant Statutory and Regulatory Background

    A.     The International Emergency Economic Powers Act and the Relevant
        Sanctions Orders and Regulations Relating to Russia and Venezuela

        9.     The International Emergency Economic Powers Act ("IEEPA"),

codified at Title 50, United States Code, Sections 1701 through 1708, conferred upon the

President the authority to deal with unusual and extraordinary threats to the national security

and foreign policy of the United States.   Section 1705 provided, in part, that "[i]t shall be

unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of

any license, order, regulation, or prohibition issued under this chapter."   50 U.S.C.

§ 1705(a).

        10.     In 2014, pursuant to his authority under the IEEPA, the President

issued Executive Order 13660, which declared a national emergency with respect to Russia's

violation of the sovereignty of Ukraine by asserting authority over the Crimean region.   To

address this national emergency, the President blocked all property and interest in property

that were then, or thereafter came within, the United States or the possession or control of

any United States person, or individuals determined by the Secretary of the Treasury to meet

one or more enumerated criteria.   These criteria included, but were not limited to,

individuals determined to be responsible for or complicit in, or who engaged in, actions or

policies that threaten the peace, security, stability, sovereignty or territorial integrity of

Ukraine; or who materially assisted, sponsored or provided financial, material or

technological support for, or goods or services to, individuals or entities engaging in such

activities.   Executive Order 13660 prohibited, among other things, transferring, paying, exporting, withdrawing or otherwise dealing in any interest in property in the United States owned by a person whose property and interests in property were blocked (a "blocked person"), as well as the making of any contribution or provision of funds, goods or services by a United States person to or for the benefit of a blocked person and the receipt of any contribution or provision of funds, goods or services by a United States person from any such blocked person.

11.     The national emergency declared in Executive Order 13660 with respect to the situation in Ukraine remained in continuous effect since 2014 and was renewed on March 2, 2022, following Russia's most recent invasion of Ukraine.

12.     On multiple occasions, the President expanded the scope of the national emergency declared in Executive Order 13660, including through: (1) Executive Order 13661, issued on March 16, 2014, which addressed the actions and policies of the Russian Federation with respect to Ukraine, including the deployment of Russian Federation military forces in the Crimea region of Ukraine; and (2) Executive Order 13662, issued on March 20, 2014, which addressed the actions and policies of the Government of the Russian Federation, including its purported annexation of Crimea and its use of force in Ukraine.   Executive Orders 13660, 13661 and 13662 were collectively referred to as the "Ukraine-Related Executive Orders."   On February 21, 2022, the President again expanded the scope of the Ukraine-Related Executive Orders, finding that the Russian Federation's purported recognition of the so-called Donetsk People's Republic and Luhansk People's Republic regions of Ukraine threatened the peace, stability, sovereignty and territorial integrity of Ukraine.

   13. The Ukraine-Related Executive Orders authorized the Secretary of the Treasury to take such actions, including the promulgation of rules and regulations, and to employ all powers granted to the President under the IEEPA, as necessary to carry out the purposes of those orders.   The Ukraine-Related Executive Orders further authorized the Secretary of the Treasury to redelegate any of these functions to other offices and agencies of the U.S. Government.

   14. To implement the Ukraine-Related Executive Orders, OFAC issued certain Ukraine-Related Sanctions Regulations.   These regulations incorporated by reference the prohibited transactions set forth in the Ukraine-Related Executive Orders.   See 31 C.F.R. § 589.201.   The regulations also provided that the names of persons designated directly by the Ukraine-Related Executive Orders, or by OFAC pursuant to the Ukraine-Related Executive Orders, whose property and interests were therefore blocked, would be published in the Federal Register and incorporated into the Specially Designated Nationals and Blocked Persons List (the "SDN List"), published on OFAC's website.   Id. n.1.

   15. Similarly, in 2015, the President issued Executive Order 13692, which declared that the situation in Venezuela, including certain actions and policies of the Government of Venezuela, constituted an unusual and extraordinary threat to the national security, foreign policy and economy of the United States and declared a national emergency under IEEPA to deal with that threat.   In multiple subsequent Executive Orders in 2017, 201, and 2019, the President continued and amplified the original declaration of a national emergency.   Among other things, these Executive Orders blocked the property and interests in property of the Government of Venezuela, as well as that of certain individuals and

entities designated by OFAC on the SDN List, including Petroleos de Venezuela S.A.

("PDVSA"), the Venezuelan state-owned oil company.

16.     To implement Executive Order 13692 and subsequent orders, OFAC

issued the Venezuela Sanctions Regulations.   See 31 C.F.R. § 591.   The Venezuela

Sanctions Regulations generally prohibited transactions involving any property or interest in

property blocked pursuant to Executive Order 13692 or any of its successor Executive

Orders, unless OFAC granted a license under the Venezuela Sanctions Regulations.   See 31

C.F.R. §§ 591.101, 591.201-591.202.

17.     Both the Ukraine-Related Sanctions Regulations and the Venezuela

Sanctions Regulations prohibited conspiring to and attempting to evade, avoid or violate the

regulations.   The prohibitions further precluded the unauthorized export of goods from the

United States to a third country if the goods were intended or destined for banned entities in

Russia or Venezuela.   Willful violations of sanctions regulations constituted criminal

offenses under IEEPA.   See 50 U.S.C. § 1705(c).

B.      The Export Control Reform Act and Export Administration Regulations

18.     The Export Administration Regulations ("EAR"), 15 C.F.R. §§ 730-

774, were promulgated by BIS to regulate the export of goods, technology and software from

the United States.   Under the Export Control Reform Act ("ECRA"), it was a crime to

violate, attempt to violate, conspire to violate or cause a violation of any regulation, order,

license or authorization issued pursuant to the statute, including the EAR.   See 50 U.S.C.

§ 4819(a)(1).   Willful violations of the EAR constituted criminal offenses under the ECRA.

See 50 U.S.C. § 4819(b).

19.     Through the EAR, the BIS reviewed and controlled the export from the United States to foreign countries of certain U.S. items.   See 15 C.F.R. §§ 734.2, 734.3.   In particular, the BIS placed restrictions on the export and re-export of items that it determined could make a significant contribution to the military potential or nuclear proliferation of other nations or that could be detrimental to the foreign policy or national security of the United States.   Under the EAR, such restrictions depended on several factors, including the technical characteristics of the item, the destination country, the end user and the end use of the item.

20.     The most sensitive items subject to the EAR controls were identified on the Commerce Control List ("CCL"), set forth in Title 15, Code of Federal Regulations, Part 774, Supplement Number 1.   Items listed on the CCL were categorized by Export Control Classification Number ("ECCN"), each of which was subject to export control requirements depending on destination, end use and end user of the item.

21.     The BIS published the names of certain foreign persons—including businesses, research institutions, government and private organizations, individuals and other types of legal persons—that were subject to specific license requirements for the export, reexport and/or transfer (in-country) of specified items.   These persons comprised the Entity List, found at Title 15, Code of Federal Regulations, Part 774, Supplement Number 4.   The persons on the Entity List were subject to individual licensing requirements and policies supplemental to those found elsewhere in the EAR, due to a determination that such persons had engaged in activities contrary to U.S. national security and/or foreign policy interests.

22.     Federal law required that any international shipment where a valid export license was required or where the commodity classified was over $2,500 be logged in

the Automated Export System ("AES") via an Electronic Export Information ("EEI") filing.

Failure to make an EEI filing or providing false or misleading information in an EEI filing in

the AES constituted a violation of 13 U.S.C. § 305.

     C.     The Arms Export Control Act and International Traffic in Arms Regulations

     23.     The export of defense articles was controlled by the Arms Export

Control Act ("AECA"), Title 22, United States Code, Section 2778.   Section 2778(a)

authorized the President to control the import and export of defense articles and to establish a

United States Munitions List ("USML"), which identified and defined the defense articles

subject to these controls.   Section 2778(b) provided that no defense articles could be

exported without a license.   Section 2778(c) established criminal penalties for any violation

of Section 2778 or any rule or regulation thereunder.

     24.     By executive order, the President delegated the authority to control the

export of defense articles to the United States Department of State, Directorate of Defense

Trade Controls ("DDTC").   The DDTC thereafter promulgated regulations under the AECA,

which were known as the International Traffic in Arms Regulations ("ITAR"), Title 22,

Code of Federal Regulations, Parts 120 through 130.   These regulations established the

USML, defined a "defense article" as any item on the USML, and required an export license

from the DDTC for the export of items listed on the USML.

III.     Overview of the Criminal Schemes

     25.     Since at least 2018, the defendants YURY OREKHOV and ARTEM

USS orchestrated a fraud, illegal export and money laundering operation under the umbrella

of NDA GmbH.   As described herein, the defendants and their co-conspirators engaged in a

variety of activities in violation of U.S. laws and regulations sanctions, including the

unlawful export of millions of U.S. dollars in military and sensitive dual-use technologies from the United States to Russia, and the use of the U.S. financial system to smuggle millions of barrels of embargoed oil from Venezuela.   In furtherance of the scheme and to launder the illicit proceeds, the defendants employed a vast network of shell companies and bank accounts throughout the world and utilized cryptocurrencies and bulk cash transactions.

26.     In electronic communications, the defendants YURY OREKHOV and ARTEM USS discussed their awareness of the applicable U.S. sanctions regimes.[2]  For example, on or about March 11, 2022, approximately two weeks after the Russian invasion of Ukraine, USS sent a message to OREKHOV stating, "They [the U.S. and European Union] are preparing four sanctions packages.   Apparently, now the governors will be included."

27.     In other electronic communications, the defendants YURY USS and ARTEM OREKHOV exchanged open-source articles regarding the imposition of U.S. and other sanctions on Russian and Venezuelan entities and commented to each other on application of those sanctions to certain Russian individuals and companies.   In an exchange on or about and between March 9, 2022 and March 10, 2022, USS wrote OREKHOV, "[Russian billionaire and founder of a multinational fertilizer company] hit by sanctions . . . why is [a different Russian billionaire] not included in the sanctions?   It[']s surreal." OREKHOV responded that the target of the sanctions was "[n]ot close to the Kremlin." USS and OREKHOV agreed that the sanctions regime was therefore not "logical."

---

[2]     Unless otherwise indicated, all quoted communications contained herein are translations of written or spoken Russian.

28.     On March 30, 2022, the defendant YURY OREKHOV asked the defendant ARTEM USS, "Have you decided to leave Russia?"   USS joked in response, "[Y]ou want to be an international fugitive?   It's too much."   OREKHOV replied, "[A]nd you?   Would you like to?   I can arrange, very easy."

A.     Procurement of Military and Sensitive Dual-Use Electronics

29.     The defendant YURY OREKHOV and his co-conspirators unlawfully sourced, purchased and shipped military and sensitive dual-use technologies from U.S. manufacturers and vendors located in the Eastern District of New York and elsewhere (collectively, the "U.S. Companies") to Russian end users, including Radioexport, Network Technologies and Abtronics, contrary to ECRA, IEEPA and other U.S. laws.   These items included advanced semiconductors and microprocessors used in fighter aircraft, missile systems, smart munitions, radar, satellites, and other space-based military applications. Components manufactured by several of the U.S. Companies were found in seized Russian weapons platforms in Ukraine.

30.     As part of the scheme, the defendants TIMOFEY TELEGIN and SERGEY TULYAKOV directed the defendant YURY OREKHOV to acquire a specific item or part from one of the U.S. Companies.   OREKHOV, the defendant SVETLANA KUZURGASHEVA, and other NDA GmbH employees would then attempt to secure the requested component from one of the U.S. Companies.   In doing so, OREKHOV, KUZURGASHEVA and their co-conspirators communicated with the U.S. Companies through email and in oral communications.   In those communications, as well as in invoices, end use statements, shipping documents and other business records used to effectuate the transactions, OREKHOV, KUZURGASHEVA and their co-conspirators misrepresented and

omitted material information, including information about how the items would be used, the parties involved in the transactions and the identities of the ultimate end users.

31.     The defendant YURY OREKHOV and his co-conspirators often falsely claimed that a Malaysian company, NDA Aerospace, was an intermediary party or an end user in transactions with the U.S. Companies.   However, NDA Aerospace was a shell entity used by the co-conspirators to obfuscate the role of Russian or other sanctioned entities in these transactions.   As of June 2022, of the several addresses affiliated with NDA Aerospace in Malaysia—including the addresses listed on end use statements and locations where NDA Aerospace had supposedly received previous shipments of U.S.-origin items—only one location had any visible signage for NDA Aerospace and consisted of an empty room in a strip mall.   As of June 2022, two other purported NDA Aerospace locations were occupied by other businesses, while an individual located at a fourth purported address claimed to be the "account manager" for NDA Aerospace, acknowledged that NDA Aerospace had no physical presence in Malaysia, and provided contact information for ORKEHOV and for KUZURGASHEVA, which included a Russian phone number, an NDA GmbH email in the name of "Lana Neumann," and a second email address with the handle "kuzurgasheva.nda."

32.     The defendant YURY OREKHOV and his co-conspirators also falsely claimed to the U.S. Companies that certain items were to be used by the Russian state space corporation ROSCOSMOS and other Russian space program entities, which was a common method of sanctions evasion used by Russian actors to obtain sensitive technologies, as the space program was subject to less stringent oversight and regulation by the United States.

33.     The defendants TIMOFEY TELEGIN and SERGEY TULYAKOV assisted in evading export restrictions and ensured that the items and components reached the

intended Russian end users.   For example, in an April 3, 2018 email from TULYAKOV to the defendant YURY OREKHOV, TULYAKOV attached a letter on Network Technologies letterhead, noting a particular contract number and highlighting that "25 out of 42 units" had been transferred to the Research Institute of Precision Instruments in Moscow, Russia, which manufactured radio-electronic equipment and software systems for Russia's military, intelligence agencies and space industry.   The letter described various "pieces" that were in the "warehouse of JSC Network Technologies [TULYAKOV's company]," or otherwise prepared for shipment to Russia.   The letter added that export to Russia of several "pieces" was prohibited due to "export licenses" and "end user certificates" and stated that "cargo [was] being detained by the manufacturer until the end user is confirmed."

34.      As a result of their material misrepresentations and omissions, the defendants YURY OREKHOV, SVETLANA KUZURGASHEVA, TIMOFEY TELEGIN, and SERGEY TULYAKOV caused the U.S. Companies to sell and export sensitive military and dual-use items in violation of U.S. laws and regulations, and process and accept payments in furtherance of such illicit transactions.   The defendants also caused documents containing false and misleading information, including export license applications and required EEI filings regarding the ultimate consignee and purchaser, to be filed with the DOC, BIS and other U.S. government entities.

B.      Smuggling Oil from Venezuela for Russian and Chinese End Users

35.      The defendants YURY OREKHOV, ARTEM USS and their co-conspirators also engaged in smuggling hundreds of millions of U.S. dollars' worth of embargoed oil from PDVSA for Russian and Chinese end users, including the Aluminum

Company and the largest state-owned oil refining, gas and petrochemical conglomerate (the "Chinese Conglomerate") in the People's Republic of China (the "PRC").

36.    Indeed, as reflected in numerous documents from the Aluminum Company and NDA GmbH, the defendants YURY OREKOV and ARTEM USS repeatedly purchased oil from PDVSA, causing U.S. financial institutions to process U.S. dollar-denominated payments, and supplied it to the Aluminum Company.   For example, in a March 2020 draft letter addressed to a Deputy of the State Duma (one of the chambers of Russian parliament), who was an associate of the Oligarch, NDA GmbH proposed alternate sources of supply for "[Aluminum Company] procurement," including using a "small, aggressive trader" that "conducts high-risk transactions in the Caribbean region, including with the Venezuelan state-owned company PDVSA, which is under sanctions, [and] has excess profits due to a 40% discount on the selling price of oil."   On or about December 4, 2021, in a series of electronic communications between OREKHOV and the defendant JUAN FERNANDO SERRANO PONCE, OREKHOV wrote, "this is our mother company," pasting a link to the Aluminum Company's website and a link to the Oligarch's Wikipedia page.   OREKHOV stated, "He [the Oligarch] is under sanctions as well.   That's why we [are] acting from this company [NDA GmbH].   As fronting."   SERRANO responded, "My partner also haha . . . he is very close to the government.   He is one of the influence people in Venezuela.   Super close to the Vice President."   SERRANO pasted a link showing search results for a Venezuelan lawyer and businessman who was currently wanted by U.S. authorities for bribery and money laundering, an individual whose identity is known to the Grand Jury.   Later, in a series of communications between OREKHOV and SERRANO in or about March 2022, OREKHOV sought a "term contract with [PDVSA]" for "1 million

[barrels of oil] per month," and clarified that, "with [the Aluminum Company] it's an annual contract, every month, every month . . . this is stable for sure."

37.     In a March 30, 2022 message exchange between the defendants YURY OREKHOV and ARTEM USS regarding NDA GmbH's business with the Aluminum Company, USS wrote to OREKHOV, "[I]f you're serious . . . I will meet with [the Oligarch's initials] when I return to Moscow . . . and I will convey to him personally your desire to pay off all debt . . . if you don't want to work with Russia now and it's really toxic, then don't work.   I will follow this closely."

38.     Similarly, the defendant YURY OREKHOV arranged contracts and brokered large quantities of oil from PDVSA for the Chinese Conglomerate, causing U.S. financial institutions to process U.S. dollar-denominated payments.   In a February 19, 2022 message with a Singapore-based energy trader ("the Trader") whose identity is known to the Grand Jury, OREKHOV asked, "Industrie [PDVSA] has three vessels with Boscan [a type of crude oil].   One is already in Asia and the other two are getting there in a few days and they offered them to me.   Can we offer them to [the Chinese Conglomerate]?"   OREKHOV then sent a draft contract for "611,673.73 bbl [barrels of crude oil]," listing NDA GmbH as the seller and the Chinese Conglomerate as the buyer.   On February 21, 2022, the Trader wrote back to OREKHOV, "Good morning sir.   [The Chinese Conglomerate] can take this cargo. Delivery Shore tank in Singapore . . . payment 5 days after discharge . . . Kick back $6 for him and his team. . . No mention of cargo ex. Venezuela pls."   OREKHOV responded, "This for sure."   Another person OREKHOV communicated with to consummate these transactions was an official from the Chinese Conglomerate (the "Chinese Conglomerate Official"), an individual whose identity is known to the Grand Jury.

39.     In furtherance of the scheme, the defendants YURY OREKHOV, ARTEM USS, SVETLANA KUZURGASHEVA, JUAN FERNANDO SERRANO PONCE, JUAN CARLOS SOTO and their co-conspirators made and caused to be made material misrepresentations and omissions, both orally in and writing, to conceal the nature of funds passing through the U.S. financial system.   By doing so, OREKHOV, USS, SERRANO, SOTO and their co-conspirators caused U.S. financial institutions to process tens of millions in U.S. dollar-denominated payments in violation of IEEPA and other U.S. laws and regulations.   Several of these transactions were processed through correspondent accounts located in New York City and in the Eastern District of New York.

40.     As part of the scheme, the defendants YURY OREKHOV, ARTEM USS, SVETLANA KUZURGASHEVA, JUAN FERNANDO SERRANO PONCE, JUAN CARLOS SOTO and their co-conspirators used shell companies to obscure from U.S. financial institutions the transactions with PDVSA.   In one transaction, OREKHOV used fabricated letterhead for a fictitious company called "Ruspetrolex LLC," ostensibly based in St. Petersburg, Russia.   In a series of November 2021 communications with SERRANO, OREKHOV acknowledged that "Ruspetrolex LLC" is a "front" and that the "main company" is NDA GmbH but indicated that, "because of [sanctions] we are using 'fronting.'" Similarly, in a March 31, 2022 electronic conversation, the Trader asked OREKHOV for the "old copies of the 'redoc' documents . . . for your previous loadings?   We need these documents for the insurance company that [the Chinese Conglomerate] uses and for the . . . bank in Singapore . . . I will see our banker to see how we can structure [payments]."   The next day, the Trader sent OREKHOV a screenshot of a message exchange between the Trader and the Chinese Conglomerate Official in which the Trader noted that a PDVSA

reference on documents "can be easily novated." In a subsequent message, the Trader asked

OREKHOV, "[A]re you using your OOO Setevye as the seller," referring to Setevye

Tekhnologii. OREKHOV responded, "No, the company is going to be, I will give you

Dubai . . . . I think [the Chinese Conglomerate Official] has the details. It's going to be my

company in Dubai, Opus Energy. I think it's better than a Russian company. And as

options we can give a German company, NDA [GmbH]." The Trader replied, "Can I pass

the NDA KYC ['Know Your Customer' documents] to my boss or do you prefer another

company?" OREKHOV confirmed, "[S]ure. Lana [KUZURGASHEVA] will change it

from VZ [Venezuela] to Colombia."

> 41.     In documents submitted to financial institutions, the defendants YURY

OREKHOV, JUAN FERNANDO SERRANO PONCE, JUAN CARLOS SOTO and their

co-conspirators also misrepresented the type of cargo being purchased and shipped to evade

sanctions and to cause U.S. dollar-denominated payments to be processed in violation of

IEEPA and other U.S. laws. For example, in one March 21, 2022 communication where

SOTO noted to OREKHOV that "Industry [PDVSA] is crazy about the USA sanctions

conversation," OREKHOV sent SOTO a bill of lading and banking "Know Your Customer"

documents indicating that the payment related to food instead of oil. In discussing another

transaction with PDVSA, OREKHOV sent the following voice memo to a Venezuelan

banking official:

> I just needed details and the purpose of the payment like invoice for sea freight,
> for some spare parts for equipment, for the food, for product, whatever. What
> kind of payment and company details. We just do a really quick KYC, and our
> payment is going to be from a German bank, German company . . . we can pay
> to U.S. . . . No issues.

After confirming that OREKHOV would instead be delivering cash to PDVSA, the banking

official sent OREKHOV a document containing company details for a grocery and food

products wholesaler in Houston, Texas.

42.     To obscure the fact that the ships were carrying oil that originated from

PDVSA and Venezuela, the defendants YURY OREKHOV, JUAN FERNANDO

SERRANO PONCE, JUAN CARLOS SOTO and their co-conspirators caused oil tankers to

turn off their GPS signal.   For example, in a December 2019 series of communications,

OREKHOV discussed the following with co-conspirators:

> [He] is awaiting the transfer slip so that he can show the shipping company for
> them to switch off the GPS – remember they cannot right now due to insurance
> issues – but they will once they see the confirmation of transfer.   [He] will be
> speaking to the shipper regarding the tracing back of [the] voyage and look @
> the best possible way to not show Amuay [town in Venezuela] as its previous
> stop over port.

In a follow up message, OREKHOV was advised that "[t]he vessel leave[s] Amuay at

03:15am VENEZUELA time Already.   As soon as leave Venezuelan Waters GPS will be

off.   For update from Marinetraffic [a maritime analytics provider] you can see the vessel

still there, but as soon as the satellite do the new upgrade you will not find until will be

reaching Aruba."   OREKHOV responded, "[A]men."   In a subsequent message,

OREKHOV wrote that the vessel's name should not appear on any paperwork and be

referred to only as "barge," since searching the vessel's name in "Marine Traffic" would

reveal the vessel's stop in "Disneyland"—a coded reference to Venezuela.

43.     As part of the scheme, the defendant YURY OREKHOV regularly

updated the defendant ARTEM USS about NDA GmbH's transactions with PDVSA,

particularly those involving the Aluminum Company:

(a)      On or about May 21, 2021, OREKHOV sent USS a copy of a letter of credit for $14,500,000 U.S. dollars issued from a Caribbean bank to a subsidiary of the Aluminum Company for an oil purchase.

(b)      On or about and between May 21, 2021 and June 11, 2021, OREKHOV and USS engaged in a series of communications in which USS commented on the "quality of fuel or origin" and OREKHOV sent USS photographs of two oil tankers and the contact information for an Aluminum Company employee in Switzerland.

(c)      On June 14, 2021, OREKHOV sent USS a screenshot of a chat between OREKHOV and an Aluminum Company employee requesting loading inspections, a certificate of origin and other documents.   OREKHOV then wrote USS that "[t]he barge is at Kingston, Jamaica.   We need to know if [the Aluminum Company] accepts the specs or not."

(d)      On June 16, 2021, OREKHOV sent a message to USS with the words "cargo accepted," as well as a screenshot of a vessel tracking map.

(e)      On August 3, 2021, USS sent OREKHOV a draft communication to the Aluminum Company regarding business dealings with NDA GmbH. The letter began, "During the sanctions period, the Company [NDA GmbH] began to supply fuel oil for [the Aluminum Company in Guinea]."   Notably, the Aluminum Company was included in the SDN List from on or about April 6, 2018 through on or about January 27, 2019.

C.      Bank Fraud and Money Laundering

44.      In furtherance of their criminal conduct, the defendant YURY OREKHOV and his co-conspirators used a variety of methods to make illicit payments and

launder criminal proceeds, including (1) a network of shell corporations with bank accounts in various jurisdictions, (2) bulk cash payments though unlicensed money remitters, and (3) cryptocurrency payments.

45.     For example, the defendant YURY OREKHOV and his co-conspirators made bulk cash deliveries to PDVSA which, in turn, injected the funds into the global financial system.   On October 25, 2021, OREKHOV and the defendant JUAN FERNANDO SERRANO PONCE exchanged the following messages:

SERRANO:   We sold the 600.000 BBLS [barrels of oil].

OREKHOV:   You sold your 600k? Why not to us?

SERRANO:   Buyer paid 100% in cash here.   And it's done.   Next one we can speak for you.

OREKOV:     Was it locals or Russians?

SERRANO:   Russians.   The key is the cash.

OREKHOV:   We can also arrange cash.

SERRANO:   As soon as you are ready with cash we can work . . . they prefer USD [U.S. dollars].

OREKHOV: I can deliver it from Panama. In Ccs [Caracas, Venezuela] branch . . . I can give you the contact details for the bank officer. This is simply a service that they do.   We make a payment into their Panamanian account and in the same day, they give cash from Caracas . . . today bank manager can confirm you cash, and tomorrow you can see it physically . . . We also have an option to make a swap with the cash in Caracas.   But the bank thing is better . . . Send it directly to Caracas, there are no options for us because it is under the sanctions, that's why. Confirmation of funds we can give from our German bank or our Panamanian bank.

46.     As part of the money laundering scheme, the defendants YURY

OREKHOV and JUAN FERNANDO SERRANO PONCE used couriers to bring bulk cash

to Venezuela, Russia and elsewhere, where the funds were reintroduced into the global

financial system.   For example, in a November 19, 2021 message, SERRANO told

OREKHOV, "Your people can go directly to PDVSA with one of my staff and pay directly

to them.   There are 550,000 barrels . . . to load on Monday."   OREKHOV responded, "Is it

possible to give cash in Russia . . . or bank Eurofinance.   In Moscow.   This bank belong[s]

to PDVSA.   This I can do easily . . . cash source is ready."   On March 22, 2022,

OREKHOV suggested to PONCE, "[O]ne girl, she has a company in Moscow . . . I spoke

with her by phone when she was in Moscow . . . she's doing this service for the Industry

[PDVSA].   You deliver money to her, she delivers the cash.   She charges some percent.

We can make a conference call with her to discuss."

47.     As a further part of the money laundering scheme, the defendants

YURY OREKHOV, JUAN FERNANDO SERRANO PONCE and JUAN CARLOS SOTO

also consummated a transaction involving 500,000 barrels of Venezuelan oil from PDVSA

through Tether ("USDT"), a cryptocurrency pegged to the U.S. dollar.   On November 30,

2021, SERRANO wrote OREKHOV that he [SERRANO] had "just finished with [PDVSA's

Vice President for Trading and Supply].   You will be berthing tomorrow . . . on Wednesday

we have to pay 50%.   They want to increase $.50 per barrel . . . can you transfer USDT?"

OREKHOV confirmed, "[O]k. 35.5 USDT yes . . . should it be 100% USDT?   Or can some

part be cash as well?"   SERRANO responded that he knew of "one guy who can give us

cash against USDT."   A "recap" document and loading instructions for the 500,000 barrels

at "34.00 USD/BBL" was later sent to OREKHOV.   The next day, OREKHOV told

SERRANO:

No worries, no stress.   As soon as we start berthing, we will immediately
transfer.   USDT works quick like SMS.   They have the cash, I already
arranged.   I have to send the money in a few hours, and after a few hours, they
are going to have USDT.   Then you, with PDVSA people, or whoever has to
take the cash, let's say you come to the bank, check the money, confirm for
me: Yury [OREKHOV], this is 7 million, 10 million.   Every day it's different
amount.   10 million, I confirm, transfer them.   And I immediately take the
number and transfer them.   It's like SMS, and they tell you yes, Juan
[FERNANDO SERRANO PONCE] everything is ok, this money is yours.
It's quicker than telegraphic transfer, USDT.   That's why everyone does it
now.   It's convenient, it's quick.

48.     The defendants YURY OREKHOV, JUAN FERNANDO SERRANO

PONCE and their co-conspirators exchanged QR codes and cryptocurrency wallet addresses

to direct the amounts to be transferred.   The amounts ranged from several hundred thousand

to millions of dollars.   For example, on or about December 2, 2021, SERRANO sent the

following message to OREKHOV, containing four wallet addresses and the amount of

cryptocurrency, in U.S. dollars, to be transferred:

[Wallet 1] $500.000,00.
[Wallet 2] $2.030.000,00.
[Wallet 3] $1.010.000,00.
[Wallet 4] $500.000,00.

SERRANO concluded, "Please Yury [OREKHOV].   Send the confirmation.   At 10:00 I

must be in PDVSA."

IV.     Transactions with Russian End Users Involving Military and Dual-Use Technologies

49.     Since in or about 2018, the defendant YURY OREKHOV used NDA

GmbH to facilitate dozens of illicit transactions involving sensitive dual-use and military-

grade technologies from the U.S. Companies and for the benefit of Network Technologies,

Abtronics and other Russian end users.   Many of these transactions were consummated after

the defendant TIMOFEY TELEGIN, Abtronics and Radioexport—the predecessor entity of

Network Technologies, the defendant SERGEY TULYAKOV's company—were each added to the BIS Entity List.   These transactions were accomplished through material misrepresentations and omissions by OREKHOV and his co-conspirators to the U.S. Companies, U.S. government agencies and U.S. financial institutions regarding the nature and purpose of the transactions.

50.     For example, in or about March 2018, the defendant YURY OREKHOV attempted to procure advanced semiconductors from a California-based semiconductor company ("U.S. Company 1"), an entity the identity of which is known to the Grand Jury, for Network Technologies.   The semiconductor at issue had satellite and military applications, and was controlled by the DOC under ECCN 9A515.e.1 ("'Spacecraft' and related commodities"), which required a license from the BIS to export to Russia for reasons of regional stability.   On or about March 1, 2018, the defendant SERGEY TULYAKOV sent OREKHOV a false end use statement, reflecting NDA Aerospace as the ultimate consignee and claiming that "the devices will be used in Space application . . . mounted by NDA Aerospace Research Sdn Bhd.   In power modules for Earth Remote Sensing installed in . . . spacecraft which provides transportation services for the ISS [International Space Station]."   NDA Aerospace was a shell entity controlled by OREKHOV with a name falsely suggesting a connection with the Russian space program. Based on the false information provided by OREKHOV and TULYAKOV in the end use statement, OREKHOV and TULYAKOV caused U.S. Company 1 to apply for an export license containing false information.   As a result, BIS issued an export license for U.S. Company 1 to export sixty semiconductors to NDA GmbH.

51.     In or about May and June 2018, the defendant YURY OREKHOV

attempted to procure radiation-hardened, space-grade Field Programmable Gate Arrays

("FPGA") from a California-based technology and semiconductor company ("U.S. Company

2"), an entity the identity of which is known to the Grand Jury, for Network Technologies.

FPGAs were integrated circuits used in a variety of weapons systems, including ballistic

missiles and smart munitions, and were controlled by the DOC under ECCN 9A515.e1,

which required a license from the BIS to export to Russia for reasons of national security.

On or about May 23, 2018, an NDA GmbH employee sent an email inquiring about

purchasing 60 FPGAs for approximately 4.5 million Euros from a licensed distributor of U.S.

Company 2, copying OREKHOV.   In response, the distributor wrote, "[U.S. Company 2]

will arrange for a detailed export check.   This special military/space component is subject to

the strictest security measures."   An offer letter was attached to the email, listing NDA

GmbH as the "deliver to" company but did not reference Network Technologies.

OREKHOV immediately forwarded the email and offer letter to the defendant SERGEY

TULYAKOV.

52.     In or about May 2019, the defendant YURY OREKHOV attempted to

obtain radiation-hardened random-access memory ("MRAM") devices from a Pennsylvania

electronics company ("U.S. Company 3") and radiation-hardened supervisory circuits from a

California-based semiconductor company ("U.S. Company 4"), entities the identities of

which are known to the Grand Jury, for the benefit of Abtronics.   These MRAM devices and

supervisory circuits had military applications, and the MRAM devices were controlled by the

DOC under ECCN 9A515.e.2 ("'Spacecraft' and related commodities"), which required a

license from the BIS to export to Russia for reasons of regional stability, as well as for

missile technology, due to their potential use in ballistic and hypersonic missile systems.

53.     On or about May 2019, the defendant TIMOFEY TELEGIN sent the

defendant YURY OREKHOV a message that he had "five interesting positions," that is, five

items he was interested in, and listed two types of MRAM devices and three types of

supervisory circuits from U.S. Company 3 and U.S. Company 4, respectively.   TELEGIN

instructed OREKHOV, "[Y]ou can procure the positions as is or you can procure different

quantities of each position."   OREKHOV asked TELEGIN to send the necessary details.

On or about May 21, 2019, an NDA GmbH employee inquired with an electronics distributor

about the same two MRAM devices and three supervisory circuits requested by TELEGIN.

The next day, a representative of the distributor responded:

> As we discussed during our meeting in Hamburg, all [U.S. Company 3] products
> are under export control . . . and require a duly filled End Use Certificate. . . a
> [U.S. Company 3] colleague replied to me this morning: "NDA's inquiry . . .
> has attracted scrutiny because of the risks associated with goods for missions
> where Russia is involved."   Attached is our standard EUS form, which you will
> need to fill in before I can quote anything.

The end use statements corresponded to the items requested by TELEGIN in his message to

OREKHOV.   The NDA GmbH employee then forwarded the email chain to OREKHOV.

54.     On or about May 24, 2019, the defendant SVETLANA

KUZURGASHEVA sent an email to another NDA GmbH employee, instructing the

employee to fill out the "EUS [end user statement] adding the information below to get an

invoice for [U.S. Company 3 MRAM device]."   The defendant YURY OREKHOV was

copied on the email.   The MRAM device was a device that defendant TIMOFEY TELEGIN

originally requested from OREKHOV.   In her email, KUZURGASHEVA instructed the

NDA GmbH employee to falsely list NDA Aerospace, OREKOV's Malaysian shell company, as the end user on the end use statement and to indicate that the planned use of the item was "R&D."   There was no mention of Russia or any Russian counterparty in the end use statement.

55.     The defendant YURY OREKHOV also met with U.S. persons and travelled to the United States to illicitly procure sensitive military-grade items.   In or about June 2019, an associate of OREKHOV (the "Associate"), an individual whose identity is known to the Grand Jury, contacted an individual affiliated with a California-based consulting and logistics company ("Individual 1" and "U.S. Company 5," respectively), an individual whose identity, and an entity the identity of which, are known to the Grand Jury. The Associate stated that her client—later revealed to be OREKHOV and NDA GmbH— wanted to procure parts from a major multinational defense contractor for use in Russian MiG-29 fighter aircraft.   The Associate stressed that the transaction would be conducted through a Malaysian front company, NDA Aerospace, to avoid applicable sanctions and export controls.   On or about June 19, 2019, the Associate informed Individual 1 that the client was "Yury Orekhov" and provided Individual 1 with OREKHOV's NDA GmbH email address.

56.     On or about June 22, 2019, the defendant YURY OREKHOV contacted Individual 1, and OREKHOV and Individual 1 subsequently met at a hotel in Europe.   During the meeting, OREKHOV told Individual 1 that he wanted to purchase parts to be used in the Russian-made Sukhoi fighter aircraft and the American-made F-22 Raptor stealth fighter aircraft.   OREKHOV explained that, to evade export control restrictions, he would utilize the NDA Aerospace entity from Malaysia; arrange for an unidentified

Malaysian defense official to complete the necessary end user paperwork; and consummate the purchase in a manner consistent with purchases of equipment used in Malaysia's defense inventory to make the transaction appear legitimate.   Upon procurement and shipment of the equipment to Malaysia, OREKHOV would utilize his Malaysian government contacts to facilitate the export of the parts to Russia.

57.   After the meeting, Individual 1 received several inquiries from the defendant SVETLANA KUZURGASHEVA requesting assistance in obtaining a variety of military-grade components typically used in fighter jets.   In the first inquiry, occurring shortly after the meeting between defendant YURY OREKHOV and Individual 1, KUZURGASHEVA requested a quote for 18 tactical air navigation interrogators and 18 multi-mode receivers, both of which were reportedly used in the 2022 Russian SU-30SM2 fighter jets' upgraded navigation systems.   In July 2019, KUZURGASHEVA again contacted Individual 1 and requested assistance in obtaining a radiation-hardened, military-grade two-terminal temperature transducers manufactured by U.S. Company 2.   Later, on or about September 19, 2019, KUZURGASHEVA contacted Individual 1 and asked for price quotes for two communications devices that the U.S. military uses to transmit Top Secret voice and data traffic.   Both items were manufactured by a Florida-based technology company and defense contractor ("U.S. Company 6"), an entity the identity of which is known to the Grand Jury, and both items were on the USML and controlled under the ITAR and other applicable regulations.   However, Individual 1 never consummated any of the transactions proposed by OREKHOV or KUZURGASHEVA.

58.   This illicit activity continued after the Russian invasion of Ukraine in February 2022.   For example, in or about and between February 28, 2022 and March 31,

2022, NDA GmbH shipped a variety of U.S.-origin electronics to OOO Radioavtomatika

("Radioavtomatika"), a Moscow-based company that was added to the SDN List on March 3,

2022.   In facilitating payment for the items, on or about February 28, 2022, the defendant

SVETLANA KUZUGASHEVA wrote to the defendant YURY OREKHOV that "they

[Radioavtomatika] have an account at Promsvyazbank, which is under sanctions."   Indeed,

on or about February 22, 2022, PJSC Promsvyazbank, a state-owned Russian bank, was

added to the SDN List as being, per OFAC, "critical to Russia's defense sector."   On or

about March 18, 2022, KUZURGASHEVA sent OREKHOV an email with "amounts in the

table," including from "an account" with an electronics distributor in Fort Worth, Texas, an

entity the identity of which is known to the Grand Jury.   On March 19, 2022,

KUZURGASHEVA wrote to OREKHOV that she had "prepared an updated table with

delivery times for RA [Radioavtomatika] . . . I'll send them the actual invoices within 1-2

weeks."   On March 25, 2022, KUZURGASHEVA wrote that "RA [Radioavtomatika] is

waiting for information about the dates," to which OREKHOV responded "let's just get it

out of Germany and finish the shipment."

V.     Transactions Involving a Defense Contractor in the Eastern District of New York

59.   In or about and between 2018 and 2020, the defendant YURY

OREKHOV and NDA GmbH conducted multiple transactions with a technology company

and defense contractor based in the Eastern District of New York ("U.S. Company 7"), an

entity the identity of which is known to the Grand Jury.   In or about and between 2018 and

2020, U.S. Company 7 supplied OREKHOV and NDA GmbH with a variety of sensitive,

military-grade technologies in five transactions totaling over $250,000.   These items

included radiation-hardened flash memory devices, small terminal interface circuits,

advanced communication engine terminals and other parts suitable for use in various

weapons systems, military aircraft, satellites and space applications.   In these transactions,

OREKHOV listed the end user as NDA Aerospace (OREKHOV's Malaysian shell company)

or a Russian space program entity such as ROSCOSMOS.   However, Network Technologies

and other Russian entities were the true end users.   On at least one occasion, OREKHOV

represented that a particular item would be used in a space application, where the item was

only suitable for use in military aircraft or missile systems.

   60. The defendant YURY OREKHOV and his co-conspirators caused false

EEI filings as to transactions with U.S. Company 7.   OREKHOV and his co-conspirators

also caused BIS to issue export licenses to U.S. Company 7 based on materially false and

misleading information.

   61. In or about and between January and February 2019, the defendant

YURY OREKHOV and NDA GmbH procured military-grade, radiation hardened, 32-

megabit flash memory devices from U.S. Company 7 for Network Technologies.   These

items were controlled by the DOC under ECCN 9A515.e2 for national security reasons.   In

relevant paperwork, including the DOC export license and required EEI filings, NDA

Aerospace was listed as the ultimate consignee.   In furtherance of the transaction, on

January 14, 2019, the defendant SERGEY TULYAKOV sent OREKHOV a message asking

how much longer the "wait" would be as to U.S. Company 7.   OREKHOV responded that

he would be sending "it this week."   On February 4, 2019, TULYAKOV sent OREKHOV

four separate pictures of three packages and indicated that they had been received in Russia.

The labels on the packages reflected the logo for U.S. Company 7 and listed NDA GmbH as

the customer, as well as the part number corresponding to the flash memory device.

According to U.S. Company 7 records, the order pertained to the sale of nine flash memory devices to NDA GmbH for $26,307 that were shipped on or about January 14, 2019.

62.     According to BIS records, on or about October 17, 2018, an export license was issued to U.S. Company 7 to ship the nine flash memory devices from the Eastern District of New York to NDA GmbH, with NDA Aerospace as the ultimate consignee.   Similarly, the EEI filing in the AES system listed the end user of the transaction as NDA Aerospace.   Neither document referenced Network Technologies.

VI.     2022 Transaction with PDVSA for $32,945,660

63.     In or about and between February and April 2022, the defendants YURY OREKHOV and ARTEM USS purchased approximately 696,899 barrels of fuel oil from PDVSA for approximately $32,945,660 through NDA GmbH; $23,987,100 of these funds were transmitted through the U.S. financial system in violation of IEEPA and other applicable laws, including through correspondent accounts in the New York metropolitan area.

64.     In furtherance of the scheme, the defendant YURY OREKHOV communicated directly with PDVSA and through the defendant JUAN CARLOS SOTO, who acted as an intermediary.   OREKHOV also regularly updated the defendant ARTEM USS on the status of the transaction.   OREKHOV's communications with SOTO and other co-conspirators included discussion of IEEPA and other U.S. laws that prohibited U.S. dollar-denominated payments to PDVSA.

65.     In a January 2022 message exchange between the defendants YURY OREKHOV and JUAN CARLOS SOTO, OREKHOV instructed SOTO to list the destination market for the oil as "Malaysia" with a vessel "to load 150.000 on Monday [in

Gauaraguao, Venezuela], and then take on 850.000 bbl [barrels of crude oil] on Wednesday in Piar [Venezuela]."   SOTO confirmed the arrangement, but expressed concern about the size of the vessel, saying "I think the Suezmax [a type of oil tanker] is too big for Guaraguao and I'm not talking about the size, I'm talking about the vessel is too visible too provocative for people to gossip about . . . maybe we need a small vessel to do the operation under more cover."   OREKHOV responded that he had previously used vessels of this size in Guaraguao.

66.     In a message exchange on or about and between February 2 and February 5, 2022, the defendants YURY OREKHOV and JUAN CARLOS SOTO discussed what "front" companies would be used.   SOTO later sent OREKHOV documents from PDVSA recapping the proposed transaction, listing PDVSA as the seller, Setevye Tekhnologii as the buyer and the item sold as "1,000,000 bbls [barrels of crude oil]" of "fuel oil diluent petro piar."   SOTO also sent OREKHOV a screenshot of an email from a PDVSA email domain that confirmed Setevye Tekhnologii's order, the use of an oil tanker registered in Vietnam ("the Vietnamese Tanker") and that the payments would be in "USD" (U.S dollars) coming from "Dubai" and going to "two or three companies with different accounts, to China, Hong Kong and maybe Australia"—a reference to layering transactions through shell companies to obscure the underlying illicit transaction.   Also on February 5, 2022, SOTO sent OREKHOV loading instructions for the Vietnamese Tanker, which requested that documents be forwarded to the defendant SVETLANA KUZURGASHEVA at Setevye Tekhnologii's publicly listed Moscow address.

67.     On or about February 6, 2022, the defendant YURY OREKHOV sent the defendant ARTEM USS the loading instructions for the Vietnamese Tanker received

from PDVSA, as well as an invoice showing the purchaser as Setevye Tekhnologii.   USS
responded, "[Y]ay!"

      68.    On or about February 12, 2022, the defendants YURY OREKHOV and
JUAN CARLOS SOTO exchanged a series of messages as the "pumping start[ed]" and
relayed communications from the loading crew and tanker personnel to other co-
conspirators.   The next day, SOTO contacted OREKHOV regarding payments, stating "[t]he
Priority Order to make the transfers is: 1) the Australian Company transfer for $3.839.872.25
USD equivalent to 85.330 bbl 2) the Chinese Company transfer for $18.536.200 USD
equivalent to 411.915 bbl 3) the England Company transfer for $11.611.851.24 USD
equivalent to 258.041 bbl."   OREKHOV confirmed and asked, "[T]he rest USDT?"   On
February 23, 2022, OREKHOV confirmed that payments had been made:

> [P]ayment was done but the receipt we will receive from the bank within one
> hour and then I will immediately provide it to you.   Payment for Australia was
> done yesterday and to Hong Kong today.   Tomorrow morning Britain payment
> is going to be done but I will call you maybe because we might pay Britain from
> Britain.

SOTO then sent a written breakdown, listing the amount paid from each shell company,
totaling $32,945,660.

      69.    On or about February 20, 2022, the defendant YURY OREKHOV sent
the defendant ARTEM USS an internet link to a posting by an independent online service
that tracked and reported shipments of crude oil.   The posting pertained to the "Jose
Terminal in Venezuela" and potential issues regarding the "Suezmax tanker [the Vietnamese
Tanker]."

70.     In other communications, the defendants YURY OREKHOV and

JUAN CARLOS SOTO discussed front companies and locations from which payments

would be sent and received, including from Melissa Trade and Opus Energy accounts.

(a)     On or about March 9, 2022, SOTO commented, "Industry is

crazy about the USA sanctions conversation" and later sent OREKHOV a bill of lading and

falsified Know Your Customer documents that claimed the cargo was "whole green peas" or

"bulky paddy rice," ostensibly purchased by Melissa Trade.

(b)     On or about March 21, 2022, SOTO expressed concern about

dealing with Russian or Ukrainian companies, and OREKHOV replied that there were "no

worries, no issues . . . I just spoke with a banker from [an Egyptian] bank.   This is the

shittiest bank in the Emirates . . . This is Melissa's [Melissa Trade] bank.   They have no

issues, they pay to everything."   Following the denial of a payment from Melissa Trade in

furtherance of the transaction, SOTO and OREKHOV fabricated an invoice from Opus

Energy in the same dollar amount and completed the payment.

(c)     On March 30, 2022, OREKHOV reassured SOTO about the

pending payments:

> No worries, I did this personally in the bank.   Then we modified the contract
> saying that this was for fuel oil, I will provide you these documents to share with
> the Singaporean and Hong Kong company. They have to get the same
> documents.   After this they will send the SWIFT [Society for Worldwide
> Interbank Financial Telecommunication] . . . I am sure 100% that they did
> because I am the beneficiary of Opus and I did it myself.   All paperwork was
> done and I know that we are only waiting for the SWIFT.   Hopefully, very
> hopefully it's going to be today. I push them, I ask them in the bank…I ordered
> the USDT.

71.     According to records of financial institutions, these payments were

consummated in a manner consistent with communications between the defendants YURY

OREKHOV and JUAN CARLOS SOTO. Several of these U.S. dollar-denominated transactions were processed through correspondent accounts at New York City banks and the Eastern District of New York, including:

(a)     Payment of $3,839,872.25 on or about February 23, 2022 from a Melissa Trade account in the United Arab Emirates to an Australian entity;

(b)     Payment of $4,500,000 on or about March 25, 2022 from a Melissa Trade account in the United Arab Emirates to a Hong Kong general trading company;

(c)     Payment of $2,000,000 on or about March 25, 2022 from a Melissa Trade account in the United Arab Emirates to a Hong Kong general trading company;

(d)     Payment of $111,000.05 on or about March 28, 2022 from a Melissa Trade account in the United Arab Emirates to a Hong Kong general trading company; and

(e)     Payment of $13,536,228.60 on or about March 31, 2022 from an Opus Energy account in the United Arab Emirates to a Hong Kong aluminum company.

COUNT ONE
(Conspiracy to Defraud the United States)

72.     The allegations contained in paragraphs one through 71 are realleged and incorporated as if fully set forth in this paragraph.

73.     In or about and between January 2018 and September 2022, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, defendants YURY OREKHOV, ARTEM USS, SVETLANA KUZURGASHEVA, also

known as "Lana Neumann," JUAN FERNANDO SERRANO PONCE, also known as

"Juanfe Serrano," JUAN CARLOS SOTO, TIMOFEY TELEGIN and SERGEY

TULYAKOV, together with others, did knowingly and intentionally conspire to defraud the

United States by impairing, impeding, obstructing and defeating, through deceitful and

dishonest means, the lawful governmental functions of OFAC and BIS, both agencies of the

United States, in the enforcement of economic sanctions laws and regulations, and the

issuance of licenses relating to the export of goods and the provision of financial services.

74.     In furtherance of the conspiracy and to affect its objects, within the

Eastern District of New York and elsewhere, the defendants YURY OREKHOV, ARTEM

USS, SVETLANA KUZURGASHEVA, JUAN FERNANDO SERRANO PONCE, JUAN

CARLOS SOTO, TIMOFEY TELEGIN and SERGEY TULYAKOV, together with others,

committed and caused to be committed, among others, the following:

OVERT ACTS

(a)     On or about October 17, 2018, the defendants YURY

OREKHOV and SERGEY TULYAKOV caused BIS to issue export license D1135909 for

nine military-grade, radiation hardened, 32-megabit flash memory devices to Russia.

(b)     On or about January 14, 2019, the defendants YURY

OREKHOV and SERGEY TULYAKOV caused U.S. Company 7 to send nine military-

grade, radiation hardened, 32-megabit flash memory devices to Russia.

(c)     On or about February 12, 2019, the defendant YURY

OREKHOV sent an email containing materially false and misleading information to the

Director of U.S. Company 7, a person whose identity is known to the Grand Jury.

(d)     In or about May 2019, the defendant TIMOFEY TELEGIN sent a message to the defendant YURY OREKHOV asking to procure MRAM devices, which were controlled under ECCN classification number of 9A515.e.2.

(e)     On or about May 24, 2019, the defendant SVETLANA KUZURGASHEVA instructed an NDA GmbH employee to fill out an end user statement with false information.

(f)     In or about and between June 2019 and January 2020, the defendants YURY OREKHOV and SVETLANA KUZURGASHEVA attempted to procure various pieces of dual-use technology from U.S. Company 5 and U.S. Company 6.

(g)     On or about December 2, 2021, the defendant JUAN FERNANDO SERRANO PONCE sent the defendant YURY OREKHOV a message containing several wallet addresses and the amount of cryptocurrency to be transferred to each wallet, along with the message, "Please Yury [OREKHOV].   Send the confirmation. At 10:00 I must be in PDVSA."

(h)     On or about February 6, 2022, the defendant ARTEM USS received loading instructions from PDVSA and an invoice.

(i)     On or about February 28, 2022, the defendant SVETLANA KUZURGASHEVA sent the defendant YURY OREKHOV banking details for an account belonging to Radioavtomatika at Promsvyazbank.

(j)     On or about March 25, 2022, the defendants YURY OREKHOV and JUAN CARLOS SOTO caused a payment of $4,500,000 to pass through a correspondent bank account at U.S. Bank 1, an entity the identity of which is known to the Grand Jury, through the Eastern District of New York.

(k)    On or about March 31, 2022, the defendants YURY OREKHOV and JUAN CARLOS SOTO caused a payment of $13,536,228.60 to pass through a correspondent bank account at U.S. Bank 2, an entity the identity of which is known to the Grand Jury, through the Eastern District of New York.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

### COUNT TWO
(Conspiracy to Violate IEEPA)

75.    The allegations contained in paragraphs one through 71 are realleged and incorporated as if fully set forth in this paragraph.

76.    In or about and between January 2018 and September 2022, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants YURY OREKHOV, ARTEM USS, SVETLANA KUZURGASHEVA, also known as "Lana Neumann," JUAN FERNANDO SERRANO PONCE, also known as "Juanfe Serrano," and JUAN CARLOS SOTO, together with others, did knowingly and willfully conspire to violate the IEEPA, contrary to 50 U.S.C. § 1705, Executive Order 13692, and 31 C.F.R. §§ 591.101, 591.201-591.202.

77.    It was a part and an object of the conspiracy that defendants YURY OREKHOV, ARTEM USS, SVETLANA KUZURGASHEVA, JUAN FERNANDO SERRANO PONCE and JUAN CARLOS SOTO, together with others, willfully and knowingly violated the IEEPA, and the regulations promulgated thereunder, to wit; OREKHOV, KUZURGASHEVA, SERRANO, SOTO and their co-conspirators willfully and knowingly caused U.S. persons, entities and financial institutions to provide funds, goods and services to and for the benefit of PDVSA, and caused U.S. persons, entities and

financial institutions to receive funds, goods and services from PDVSA without first obtaining the required approval of OFAC, contrary to Executive Order 13692 and 31 C.F.R. §§ 591.101, 591.201-591.202.

(Title 50, United States Code, Sections 1705(a) and 1705(c); Title 18, United States Code, Sections 3551 et seq.)

## COUNT THREE
(Bank Fraud Conspiracy—Oil Smuggling Scheme)

78.     The allegations contained in paragraphs one through 71 are realleged and incorporated as if fully set forth in this paragraph.

79.     In or about and between January 2018 and September 2022, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants YURY OREKHOV, ARTEM USS, SVETLANA KUZURGASHEVA, also known as "Lana Neumann," JUAN FERNANDO SERRANO PONCE, also known as "Juanfe Serrano," and JUAN CARLOS SOTO, together with others, did knowingly and intentionally conspire to execute a scheme and artifice to defraud one or more financial institutions, to wit: U.S. Bank 1 and U.S. Bank 2, contrary to Title 18, United States Code, Section 1344(1).

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNT FOUR
(Wire Fraud Conspiracy—Illicit Procurement of U.S. Dual-Use Technology)

80.     The allegations contained in paragraphs one through 71 are realleged and incorporated as if fully set forth in this paragraph.

81.     In or about and between January 2018 and September 2022, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants YURY OREKHOV, SVETLANA KUZURGASHEVA, also known as "Lana

Neumann," TIMOFEY TELEGIN and SERGEY TULYAKOV, together with others, did

knowingly and intentionally conspire to devise a scheme and artifice to defraud one or more

U.S. companies, to wit: U.S. Company 1, U.S. Company 2, U.S. Company 3, U.S. Company

4, U.S. Company 5, U.S. Company 6 and U.S. Company 7, by means of one or more

materially false and fraudulent pretenses, representations and promises, and for the purpose

of executing such scheme and artifice, to transmit and cause to be transmitted by means of

wire communication in interstate and foreign commerce, writings, signs, signals, pictures and

sounds, to wit: electronic communications, emails and other online communications and

monetary transfers in and through the Eastern District of New York and elsewhere, contrary

to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

### COUNTS FIVE THROUGH EIGHT
(Wire Fraud)

82.     The allegations contained in paragraphs one through 71 are realleged

and incorporated as if fully set forth in this paragraph.

83.     On or about the dates set forth below, within the Eastern District of

New York and elsewhere, the defendants YURY OREKHOV, SVETLANA

KUZURGASHEVA, also known as "Lana Neumann," TIMOFEY TELEGIN and SERGEY

TULYAKOV, together with others, did knowingly and intentionally devise a scheme and

artifice to defraud one or more U.S. companies to wit: U.S. Company 1, U.S. Company 2,

U.S. Company 3, U.S. Company 4, U.S. Company 5, U.S. Company 6 and U.S. Company 7,

and to obtain money and property from said companies and financial institutions by means of

one or more materially false and fraudulent pretenses, representations and promises, and, for the purpose of executing such scheme and artifice, transmitted and caused to be transmitted one or more writings, signs, signals, pictures and sounds by means of wire communication in interstate and foreign commerce, to wit: the wire transmissions set forth below:

| Count | Approximate Date of Wire Transmission | Description of Wire Transmission |
| --- | --- | --- |
| FIVE | February 12, 2019 | Email from OREKHOV, copying KUZURGASHEVA, to the Director of U.S. Company 7 regarding an item requested by TULYAKOV |
| SIX | April 5, 2019 | $145,568.89 wire transfer from an NDA GmbH account Germany to a U.S. Company 7 account in New York City that passed through the Eastern District of New York |
| SEVEN | April 17, 2019 | $146,419.27 wire transfer from an NDA GmbH account Germany to a U.S. Company 7 account in New York City that passed through the Eastern District of New York |
| EIGHT | May 24, 2019 | Email from KUZURGASHEVA, copying OREKHOV, regarding an end use statement and invoice for an item requested by TELEGIN from U.S. Company 3. |

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

COUNT NINE
(Money Laundering Conspiracy—Oil Smuggling and IEEPA Scheme)

84.     The allegations contained in paragraphs one through 71 are realleged and incorporated as if fully set forth in this paragraph.

85.     In or about and between January 2018 and September 2022, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants YURY OREKHOV, ARTEM USS, SVETLANA KUZURGASHEVA, also known as "Lana Neumann," JUAN FERNANDO SERRANO PONCE, also known as

"Juanfe Serrano," and JUAN CARLOS SOTO, together with others, did knowingly and intentionally conspire to:

      (a)    transport, transmit and transfer monetary instruments and funds from one or more places in the United States to and through one or more places outside the United States and to one or more places in the United States to and through one or more places outside the United States, (i) with the intent to promote the carrying on of specified unlawful activity, to wit: conspiracy to violate IEEPA as charged in Count Two, contrary to Title 18, United States Code, Section 1956(a)(2)(A); and (ii) which transactions in fact involved the proceeds of unlawful activity, to wit: conspiracy to violate IEEPA as charged in Count Two, knowing that the monetary instruments and funds involved in the transportation, transmission and transfer represented the proceeds of said unlawful activity, and knowing that such transportation, transmission and transfer was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of said specified unlawful activity, all contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i); and

      (b)    engage in one or more monetary transactions within the United States in criminally derived property of a value greater than $10,000 that was derived from specified unlawful activity, to wit: conspiracy to violate IEEPA as charged in Count Two, contrary to Title 18, United States Code, Section 1957(a).

      (Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

COUNT TEN
(Money Laundering Conspiracy—Illicit Procurement of U.S. Dual Use Technology)

86.     The allegations contained in paragraphs one through 71 are realleged and incorporated as if fully set forth in this paragraph.

87.     In or about and between January 2018 and September 2022, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants YURY OREKHOV, SVETLANA KUZURGASHEVA, also known as "Lana Neumann," TIMOFEY TELEGIN and SERGEY TULYAKOV, together with others, did knowingly and intentionally conspire to:

(a)     transport, transmit and transfer monetary instruments and funds from one or more places in the United States to and through one or more places outside the United States and to one or more places in the United States to and through one or more places outside the United States, (i) with the intent to promote the carrying on of specified unlawful activity, to wit: conspiracy to commit wire fraud and wire fraud as charged in Counts Four through Eight, all contrary to Title 18, United States Code, Section 1956(a)(2)(A); and (ii) which transactions in fact involved the proceeds of unlawful activity, to wit: conspiracy to commit wire fraud and wire fraud as charged in Counts Four through Eight, knowing that the monetary instruments and funds involved in the transportation, transmission and transfer represented the proceeds of said unlawful activity, and knowing that such transportation, transmission and transfer was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of said specified unlawful activity, all contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i); and

(b) engage in one or more monetary transactions within the United States in criminally derived property of a value greater than $10,000 that was derived from specified unlawful activity, to wit: conspiracy to commit wire fraud and wire fraud as charged in Counts Four through Eight, all contrary to Title 18, United States Code, Section 1957(a).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

COUNT ELEVEN
(Conspiracy to Violate ECRA)

88. The allegations contained in paragraphs one through 71 are realleged and incorporated as if fully set forth in this paragraph.

89. On or about and between August 13, 2018 and September 2022, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants YURY OREKHOV, SVETLANA KUZURGASHEVA, also known as "Lana Neumann," TIMOFEY TELEGIN and SERGEY TULYAKOV, together with others, did knowingly and willfully conspire to violate and to cause one or more violations of licenses, orders, regulations and prohibitions issued under the Export Control Reform Act.

90. It was a part and an object of the conspiracy that the defendants YURY OREKHOV, SVETLANA KUZURGASHEVA, also known as "Lana Neumann," TIMOFEY TELEGIN and SERGEY TULYAKOV, together with others, would and did agree to export and cause to be exported from the United States to Russia items on the Commerce Control List, set forth in Title 15, Code of Federal Regulations, part 774,

Supplement Number 1, without having first obtained a license for such export from the U.S. Department of Commerce.

(Title 50, United States Code, Sections 4819(a)(1), 4819(a)(2)(A)-(G) and 4819(b); Title 15, Code of Federal Regulations, Section 736.2(b)(1))

## COUNT TWELVE
### (Smuggling Goods from the United States)

91.      The allegations contained in paragraphs one through 71 are realleged and incorporated as if fully set forth in this paragraph.

92.      In or about and between January 2018 and September 2022, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants YURY OREKHOV, SVETLANA KUZURGASHEVA, also known as "Lana Neumann," TIMOFEY TELEGIN and SERGEY TULYAKOV, together with others, did fraudulently and knowingly export and send from the United States, merchandise, articles and objects, to wit: items on the Commerce Control List, set forth in Title 15, Code of Federal Regulations, Part 774, Supplement Number 1, contrary to United States laws and regulations, to wit: Title 50, United States Code, Section 4819(a)(1), 4819(a)(2)(A)-(G) and 4819(b) and Title 15, Code of Federal Regulations, Section 736.2, and did fraudulently and knowingly receive, conceal and facilitate the transportation and concealment of such merchandise, articles and objects, prior to exportation, knowing the same to be intended for exportation, contrary to such United States laws and regulations.

(Title 18, United States Code, Sections 554(a), 2 and 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNTS TWO AND TWELVE

93.    The United States hereby gives notice to the defendants charged in
Counts Two and Twelve that, upon their conviction of either of the offenses charged therein,
the government will seek forfeiture in accordance with Title 18, United States Code, Section
981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person
convicted of such offenses to forfeit any property, real or personal, constituting, or derived
from, proceeds traceable to such offenses.

94.    If any of the above-described forfeitable property, as a result of any act
or omission of the defendants:

(a)    cannot be located upon the exercise of due diligence;

(b)    has been transferred or sold to, or deposited with, a third party;

(c)    has been placed beyond the jurisdiction of the court;

(d)    has been substantially diminished in value; or

(e)    has been commingled with other property which cannot be

divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p),
to seek forfeiture of any other property of the defendants up to the value of the forfeitable
property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States
Code, Section 853(p); Title 28, United States Code, Section 2461(c))

CRIMINAL FORFEITURE ALLEGATION
AS TO COUNTS THREE THROUGH EIGHT

95.     The United States hereby gives notice to the defendants charged in Counts Three through Eight that, upon their conviction of any of the offenses charged therein, the government will seek forfeiture in accordance with: (a) Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any property, real or personal, which constitutes or is derived from proceeds traceable to such offenses; and/or (b) Title 18, United States Code, Section 982(a)(2), which requires any person convicted of such offenses to forfeit any property constituting, or derived from, proceeds obtained directly or indirectly as a result of such offenses.

96.     If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with, a third party;

(c)     has been placed beyond the jurisdiction of the court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(2); Title 21,

United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

CRIMINAL FORFEITURE ALLEGATION
AS TO COUNTS NINE AND TEN

97.     The United States hereby gives notice to the defendants charged in

Counts Nine and Ten that, upon their conviction of either of the offenses charged therein, the

government will seek forfeiture in accordance with Title 18, United States Code, Section

982(a)(1), which requires any person convicted of such offenses to forfeit any property, real

or personal, involved in such offenses, or any property traceable to such property.

98.     If any of the above-described forfeitable property, as a result of any act

or omission of the defendants:

        (a)    cannot be located upon the exercise of due diligence;

        (b)    has been transferred or sold to, or deposited with, a third party;

        (c)    has been placed beyond the jurisdiction of the court;

        (d)    has been substantially diminished in value; or

        (e)    has been commingled with other property which cannot be

divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p),

as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any

other property of the defendants up to the value of the forfeitable property described in this

forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(1) and 982(b)(1); Title 21,

United States Code, Section 853(p))

## CRIMINAL FORFEITURE ALLEGATION
### AS TO COUNT ELEVEN

99.     The United States hereby gives notice to the defendants charged in

Count Eleven that, upon their conviction of the offense charged therein, the government will

seek forfeiture in accordance with Title 50, United States Code, Section 4819(d)(1), which

requires any person convicted of such offense to forfeit any of the person's property (a) used

or intended to be used, in any manner, to commit or facilitate the offense; (b) constituting or

traceable to the gross proceeds taken, obtained or retained, in connection with or as a result

of the offense; and/or (c) constituting an item or technology that was exported or intended to

be exported in violation of the Export Control Reform Act.

100.    If any of the above-described forfeitable property, as a result of any act

or omission of the defendants:

> (a)     cannot be located upon the exercise of due diligence;
>
> (b)     has been transferred or sold to, or deposited with, a third party;
>
> (c)     has been placed beyond the jurisdiction of the court;
>
> (d)     has been substantially diminished in value; or
>
> (e)     has been commingled with other property which cannot be

divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p),

as incorporated by Title 50, United States Code, Section 4819(d)(2), to seek forfeiture of any

other property of the defendants up to the value of the forfeitable property described in this

forfeiture allegation.

(Title 50, United States Code, Sections 4819(d)(1) and 4819(d)(2); Title 21,

United States Code, Section 853(p))


A TRUE BILL


_____
FOREPERSON


_____
BREON PEACE
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK